IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

BRUCE SALASAR,

        Plaintiff,

vs.                                                            No.  10cv0996 DJS

MICHAEL J. ASTRUE,
COMMISSIONER OF SOCIAL SECURITY,

        Defendant.

<u>MEMORANDUM OPINION AND ORDER</u>

      **THIS MATTER** is before the Court on Plaintiff's (Salasar) Motion to Reverse or

Remand the Administrative Decision **[Doc. No. 16]**, filed March 3, 2011, and fully briefed on

June 2, 2011.  On November 25, 2009, the Commissioner of Social Security issued a final

decision denying Salasar's claim for supplemental security income payments. [1]  Salasar seeks

judicial review of the Commissioner's final decision pursuant to 42 U.S.C. § 405(g).  Having

considered the arguments, pleadings, administrative record, relevant law, and being otherwise

fully informed, the Court finds that the motion to remand is not well taken and will be **DENIED**.

<u>I.  Factual and Procedural Background</u>

      Salasar, now forty-eight years old (D.O.B. April 18, 1963), filed his application for

supplemental security income payments on November 2, 2007, alleging disability since October

30, 2007 (Tr. 11), due to bipolar disorder  Tr. 213.  Salasar has a Bachelor of Fine Arts Degree

and past relevant work as a graphic designer and as a day laborer.  Tr. 79.  On November 25,

---

[1] Although Salasar indicates in his Memorandum Brief (Doc. No. 17) that he is appealing the denial of his applications for "Disability Insurance Benefits and SSI," the record reflects that he applied only for SSI.  Tr.11, 29, 32, 56-61.

2009, the Administrative Law Judge (ALJ) denied supplemental security income payments.  Tr. 22.  On September 16, 2010, the Appeals Council denied Salasar's request for review of the ALJ's decision.  Tr. 1.  Hence, the decision of the ALJ became the final decision of the Commissioner for judicial review purposes.  Salasar seeks judicial review of the Commissioner's final decision pursuant to 42 U.S.C. § 405(g).

## II.  Standard of Review

The standard of review in this Social Security appeal is whether the Commissioner's final decision is supported by substantial evidence and whether he applied correct legal standards. *Hamilton v. Secretary of Health and Human Servs.,* 961 F.2d 1495, 1497-98 (10th Cir. 1992). Substantial evidence is more than a mere scintilla and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Glass v. Shalala*, 43 F.3d 1392, 1395 (10th Cir. 1994).  "Evidence is not substantial if it is overwhelmed by other evidence in the record or constitutes mere conclusion."  *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992).  Moreover, "all of the ALJ's required findings must be supported by substantial evidence," *Haddock v. Apfel,* 196 F.3d 1084, 1088 (10th Cir. 1999), and all of the relevant medical evidence of record must be considered in making those findings, *see Baker v. Bowen*, 886 F.2d 289, 291 (10th Cir. 1989).  "[I]n addition to discussing the evidence supporting his decision, the ALJ must discuss the uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects."  *Clifton v. Chater*, 79 F.3d 1007, 1010 (10th Cir. 1996).  Therefore, while the Court does not reweigh the evidence or try the issues de novo, *see Sisco v. United States Dep't of Health & Human Servs.*, 10 F.3d 739, 741 (10th Cir. 1993), the Court must meticulously examine the record as a whole, including anything that may undercut or

detract from the ALJ's findings, in order to determine if the substantiality test has been met.  *See*

*Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994).

### III.  Mental Health Records

On June 26, 2006, Peggy Halter LPCC (Licensed Professional Clinical Counselor) with

Healthcare for the Homeless-Clinical completed a "New Clinical Assessment."  Tr. 231-233.

Halter noted:

> Client is a 43 year old male staying at AOC.  **Client got out of jail month ago**.  Past
> dx PTSD, ADHD, and chronic depression.  Frustration and anger level is increased.
> Appetite is good.  Sleep is poor, always thinking, always worrying.  Client has
> chronic depression and on scale from 1-10 his depression level is 7 with s/s
> (symptoms) of hopelessness, helplessness, sitting alone, no motivation to do
> anything.  Client is recovering alcoholic for 7 years but is getting triggered.  Client
> has hx of prison terms.  PTSD s/s of flashbacks, hypervigilence, reaction to loud
> noises, can't be around crowds, high frustration and anger, scared for no reason.  No
> s/s of mania.  No psychoses.  Years ago was in dual dx program in NY where he was
> dx with PTSD and depression.  Three suicide attempts with most recent 1999.

Tr. 231.  Halter completed a "Mental Status Screening," noting Salasar's behavior was

inappropriate, he was overly anxious, his mood and affect were inappropriate, he seemed

depressed, his speech was inappropriate and pressured, his thought process was appropriate, and

he was oriented to time, place, and person.  Tr. 231.  Salasar reported he had been on Celexa for

four months.  Tr. 232.  Halter assessed Salasar with Depression, Major, Recurrent, Moderate and

PTSD, Chronic. Tr. 233.  Halter recommended an appointment with a "psych provider."  *Id.*

On March 21, 2007, Salasar self-referred and was admitted to the detox unit at the

Turquoise Lodge.  Tr. 237-250.  He reported "he had no previous substance abuse or psychiatric

care or treatment in New Mexico."  Tr. 238.  He was not on any medication at the time.  Tr. 241.

Salasar stated the reason for admission was, "I guess it's lot of things, basically I want my life

back.  I have been homeless since they released me from prison last year.  I lost my job.  I have

lost everything." Tr. 237.  **According to Salasar, he "had worked at a legitimate job until three weeks ago as a graphic artist. Tr. 239.  However, this job ended "because of drug use." *Id*.**

Cliff Brasher, M.D., a physician with HCH-Clinical, performed an evaluation.  The "History of Present Illness" indicates as follows:

> Cocaine:  Began using in 1986, initially sporadically consuming the salt form nasally, began using crack cocaine in 1985, finding himself quickly addicted.  **Most recently, the patient has been smoking crack cocaine, averaging an eighth of an ounce a day.  He typically purchases his cocaine already "rocked up."  He has been using cocaine in these amounts and in this manner more or less continuously since May 2006.**

> Alcohol: The patient states that he began drinking alcohol at the age of 16, it has been a serious problem repetitively ever since.  The patient states that he became alcoholic at an early age, typically drinking in excess of a fifth of whisky per day. He typically consumes alcohol in a binge style fashion, his last binge ended in 1995. He states that when he drinks alcohol he frequently becomes violent and explosive. He has severe "blackouts."  He is not drinking now and initially denied any recent use of alcohol.  However, later during the interview, he admitted to "one beer" on the morning of admission.

Tr. 237.  Salasar also reported using amphetamines and marijuana beginning at age 16, an using marijuana intermittently approximately less than an ounce a month.  *Id.*  He reported his recent drug use as "past few weeks."  Tr. 238.  Salasar also reported smoking a pack of cigarettes per day.  Tr. 241.  **On March 20, 2007, the morning before his admission, Salasar had used 1/8 ounce of crack cocaine, smoked one joint of marijuana and had "one beer" early in the morning**.  *Id.*

As to his legal history, Salasar reported he was charged with attempted murder but convicted of assault for which he served six years (New York), convicted of third degree arson for which he served four years (New York) and was convicted of attempted robbery for which he served four years and was convicted for attempted robbery in New Mexico for which he served

4

2 ½ years.  He was released from prison in 2006.  Salasar admitted "that in the past these behaviors have resulted in the loss of multiple jobs, school failure, loss of relationships, financial problems, he is now homeless, estranged from family and friends."  *Id.*

Salasar reported he had received treatment for his addiction/substance abuse in 2001 at a place called Freedom House in New York.  Tr. 238.  He voluntarily enrolled in the program after his release from prison for his third incarceration.  *Id.*  Salasar stayed six months.  Salasar reported he had been treated with Zoloft, Celexa, Wellbutrin, and Seroquel at Freedom house, but ultimately stopped taking psychotropic medications when his attempt to secure long term SSI benefits was denied.  Tr. 241.  Salasar stated he had "subsequently stayed "clean and sober" until his lapse in May [2006].  Tr. 238.  **Dr. Brashar noted Salasar's longest period of sobriety was between 1995 and May 2006, with "[m]ost of this 'clean time' occurr[ing] while incarcerated in prison."  Tr. 239.  Notably, Salasar "earned a Bachelor's Degree of Fine Arts while in prison and has almost enough credits for a second Bachelor's Degree."**  *Id.* **Salasar also reported that when he was clean and sober he enjoys softball, watching movies and football on TV.**  Tr. 241.

Dr. Brashar completed a "Review of Systems" and noted Salasar suffered from a chronic "crack cough" but otherwise Salasar did not report any other problems other than a need to see a dentist.  *Id.*  Salasar also reported a 40 to 50 weight loss since he had been released from prison. He was 5 feet 6 inches and 158 pounds at the time of admission.  Tr. 242.

The Mental Status Examination indicated as follows:

Level of Consciousness: Presently, the **patient is alert and oriented to time, person, place and situation;** he is found to be sincere, probably truthful with no inconsistencies noted during the interview.

Mood: "relieved."

5

**Appropriate: Yes**

**Affect: Full, no lability**.

**Speech: Fluent**.

**Psychotic Symptoms: Denied, even when toxic on cocaine.**

**Suicidality: Denied, no suicidal thoughts subsequent to the age of 17.**

**Impulse control: Adequate in general, poor when under the influence of alcohol**, easily provoked into violence, acknowledges that he has "issues" with men.

Aggressive/Homicidal Urges: Describes his personality as "passive-aggressive." Acknowledges a massive history of violence usually in self defense, also in the interest of preserving property and defending family and loved ones.

**Thought Content: Linear**.

Memory/Lt-St (long term and short term): Acknowledges a history of severe blackouts when under the influence of **alcohol, short term memory intact otherwise.**  Childhood recall intact, most childhood memories are dysphoric in content.

Preoccupations: Detox/treatment, wanting his life back.

Gambling: Denied.

Other: The patient acknowledges that he tends to hang on to resentments for extended periods of time.  He told me that he relapsed over the "fourth step" in AA.  He admits that he has serious anger issues, previously treated for anger management while incarcerated. He recognizes that his anger often comes out "sideways" at innocent bystanders.

Tr. 242.

The physical examination revealed a **"well-nourished, well-developed, heavily muscled adult white male in no acute distress**."  Tr. 242.  Other than scoliosis and rare inspiratory wheezes on the right, the examination was unremarkable.  Dr. Brashar diagnosed Salasar with the following: Axis I – (1) **Cocaine dependence; Continuous;** (2) Alcohol

6

dependence; Episodic; (3) Nicotine dependance; Continuous; (4) Cannabis dependence; Episodic, (5) Stimulant withdrawal syndrome; Mild; (6) PTSD; chronic, by history.  Under Axis II– (1) Antisocial personality disorder; (2) Passive-aggressive traits; (3) Avoidant traits; (4) Narcissistic traits.  Under Axis III– (1) Poor dentition; (2) 50-pound weight loss, by history; (3) Reactive airway disease; Mild; (4) History of self-inflicted injury (cutting wrist): Age 17; (5) History of gunshot would (x1) stabbings (numerous); Remote past; (6) Healthcare neglect. Under Axis IV– Psychosocial and environmental stressors: Moderate to severe: Unemployed, homeless, dependent on others, estranged from family and friends, anger management issues, addict lifestyle, Axis II Issues, history of unprovoked violence, legal problems, financial problems.  Under Axis V– Global Assessment of Functioning is 20/20.  Tr. 243-244.

Dr. Brashar prescribed (1) Serax (limited to 15 mg) as needed for cocaine/alcohol and cannabis dependence; (2) Inderal, Risperidone and psychiatric intervention for anger management issues; (3) Zoloft for mood disorder and psychiatric intervention; (4) screening labs, sequential evaluation and routine immunizations for healthcare neglect (refused all except Tetanus); and (4) referred to community dental as needed for poor dentition after discharge.  Tr. 244-245.

On March 26, 2007, Ilona Csapo, at Dr. Brashar's request, performed a psychiatric evaluation.  Tr. 250-252.  Dr. Csapo reported Salasar was complaining of feeling sedated on his daily dose of Risperdal.  Accordingly, Dr. Csapo discontinued the daytime dose and changed it to a p.r.n. (as needed) basis.  Tr. 252.  **Salasar denied any symptoms of anxiety or significant mood symptoms**.  Tr. 250.  **Dr. Csapo performed a Mental Status Examination noting Salasar was alert and oriented though quite sedated, his affect was congruent, his thought processes were linear to questioning, Salasar denied auditory or visual hallucinations or**

**suicidal or homicidal ideation, and his judgment and insight were fair**.  Tr. 253.  Dr. Csapo

noted **there had been no episodes of impulsive anger or erratic moods while at Turquoise**

**Lodge and at time of examination there was no psychiatric acuity**.  *Id.*  Dr. Csapo concurred

with Dr. Brashar's diagnoses and assigned a GAF score of 32.  *Id.*  Dr. Csapo followed Salasar

as an inpatient.  Tr. 252.

On April 17, 2007, Dr. Brashar discharged Salasar.  Tr. 247-249.  Dr. Brashar's

discharge summary indicates the following:

> On admission, the patient gave a history of mood instability/chronic depression in the past for which Zoloft had been previously found to be helpful, although the patient reported that the Zoloft also caused significant sexual dysfunction for him**. Nonetheless, the Zoloft was restarted to 50 mg a day, increased to 100 mg a day prior to discharge with marked subjective improvement in his mood, energy level, and attitude**.  Wellbutrin was initiated beginning at 100 mg a day, gradually tapered upwards to the discharge dose noted below (200 mg b.i.d.).  Wellbutrin was added in an effort to counteract reported side effects associated with the Zoloft, also provided in effort to enable the patient to successfully quit smoking during this admission, also provided in an effort to decrease cravings for stimulants.  The patient reported marked subjective improvement in his cravings due to use of the Wellbutrin, he also acknowledged that he had successfully quit smoking as an additional benefit.

> **Because of the patient's history of episodic violence in the past, he was placed on Risperidone routinely, 2 mg at h.s. with p.r.n. doses available during the daytime, which he rarely found necessary to use**.  Inderal was also provided in hopes of preventing him from "escalating" during the daytime, 20 mg t.i.d.  The patient reported that the Risperidone and Inderal were quite helpful, they were therefore, continued on discharge as noted below.

> Proventil was provided on a routine basis initially, thereafter p.r.n. for his reactive airway disease for which the patient remained largely asymptomatic.

> The patient was seen for a psychiatric consultation by Ilona Csapo, M.D. shortly after his admission.  She concurred with those diagnoses noted above, also with the choice of medications reflected below.  Her consult and subsequent visits are documented elsewhere in the medical record and will not be reviewed in detail here.

> **The patient never demonstrated any oppositional nor violent behavior directed towards peers or staff.  He completed all goals and objectives set by his therapist and his treatment team, he did well in treatment**.
>
> Condition on Discharge: Medically stable, **euthymic** (normal, non-depressed stable mood).

Tr. 248.

On discharge, Dr. Brashar (1) recommended indefinite abstinence from cocaine, alcohol, and all addictive substances, (2) referred Salasar to a 12-step support group to attend daily for a period of at least 90 days and secure a sponsor as soon as possible, (3) recommended ongoing therapy, treatment and counseling for his addictive disorder and related issues; and (5) continued ongoing medical care/management of his various health problems through Healthcare for the Homeless.  Tr. 249.  Dr. Brashar provided a three day supply of all the medications along with a written prescription for all five medications for a one-month supply of each with p.r.n. refills. *Id*.  **The prognosis was "Good, provided the patient follow through with all discharge recommendations noted above**." *Id*.

On October 1, 2007, Christina Carlson, APRN, BC (Advanced Practice Registered Nurse-Board Certified), a nurse at Albuquerque Health Care for the Homeless-Psychiatry (HCH), performed a new "Psychiatric Patient Screenings and Assessments" on Salasar.  Tr. 227-231.  Carlson noted Salasar's chief complaint as "Requesting meds for depression, PTSD, ADHD, and anti-social.  Provider statement to be signed for GA (State General Assistance).  Referral for counseling."  Tr. 227.  Carlson further noted:

> Pt is a 44 yo man who states he came out of prison in 2002 (sic).  Sober since 1995.  Pt has very pressured speech, tangential thought processes, difficult to follow.  **Has been using crack more recently for past 1 year.  <u>Got tx (treatment) at Turquoise and relapsed, now in recovery for 62 days, staying at Recovery house</u>**.  Pt attends meetings and has a sponsor.  Likes crack because "it took all my pain away."  Pt is from NY– family is there but pt is not close to them.  Mat gm was

9

schizophrenic and was institutionalized, mom has mood swings. Pt has "ups and downs." Pt has "never successfully lived my life," not able to hold onto a job. Degree in fine arts– working on his bachelors– poss landscape design. Has made 2 suicide attempts by slashing wrists, once when drinking, and most recently tried to jump in front of the Rail Runner before going to Turquoise Lodge– "just couldn't go on." Instead went to Turquoise Lodge. Pt has a lot of trauma in his hx, including physical abuse by stepfather and trauma from prison as an adult. Pt has flashbacks from his trauma, numbing and anxiety. **Pt is labile and irritable, somewhat agitated**.

Tr. 227. Salasar reported having "diminished mental capacity, difficulty concentrating, difficulty making decisions, excessive worrying, anticipating the worst, irritability, startling easily, crying easily, unable to relax, insomnia." Tr. 228. Salasar also reported "experiencing the following manic symptoms: decreased need for sleep, inability to stop talking, easy distractibility, involvement in risky activities, having racing thoughts." *Id.*

Carlson assessed Salasar with (1) Bipolar, manic, (2) PTSD, (3) chronic Cocaine dependence. Tr. 227, 228. Carlson prescribed Depakote ER (used to treat the manic phase of Bipolar disorder) 500 mg one qhs (at bedtime) x3 then 2 at hs and Risperdal 1 mg qhs (used to treat manic phase of Bipolar disorder). *Id.* Carlson directed Salasar to return in one week and referred him to counseling. Carlson also took care of Salasar's General Assistance paperwork.

On December 4, 2007, Salasar returned to HCH for a follow up. Tr. 298. **Carlson performed a Mental Status Exam, noting: (1) affect- consistent; (2) attitude- cooperative; (3) speech- within normal limits; (4) appearance- appropriate; (5) mood- consistent; (6) insight- good; (7) judgment- good**. Under "Progress Note," Carlson noted:

Pt doing "OK" still staying at the Sobriety House. Pt getting therapy at Dragonfly counseling because Pathways lost their funding. Depakote made him very agitated and increased his BP. Pt also went off his Risperdal. Pt has very pressured speech, tangential thought processes. Hyper "all the time," drinking a lot of coffee. Pt has only met once with counselor, hasn't dealt with trauma yet. Stopped taking both meds after one week. Clean 4 month, craves at times, esp when saw other residents smoking crack and meth at his Recovery House. Pt has short fuse and a lot of

10

anxiety, irritability.  Pt had incident recently at meeting where he put hands on another member's neck after that member was rude "like my stepfather."

Tr. 299.  Carlson assessed Salasar as "Irritable, short fuse, moody."  *Id.*  Carlson prescribed Zoloft, Risperdal and Viagra.   Salasar was to return for a follow up in two weeks.

On December 18, 2007, Salasar returned to HCH for a follow up.  Tr. 295-297.  **Carlson performed a Mental Status Exam, noting: (1) affect- consistent; (2) attitude- cooperative; (3) speech- pressured; ( 4) appearance- appropriate; (5) mood- consistent; (6) quality of thought- racing, tangential, concrete, distractible; (7) insight- fair; and (8) judgment- fair**.

Under "Progress Note," Carlson noted:

> Pt now going to Dragonfly Housing because last counselor "didn't show up for his appts 3 times."  Pt has pressured speech, **thoughts better organized.  Feels that Zoloft is helping him to calm down some, wanting to go up to 100 mg qd.  States that his cravings are there, but decreased, less irritable, overall.  Staying clean, almost 5 months.  States that overall he is feeling better, sleeping and eating well.**  Nightmares are gone.

Tr. 296.  Carlson assessed Salasar as "doing better, still agitated."  *Id.*  Carlson increased the Zoloft to 100 mg qd (every day) and directed him to return in one month.

On January 16, 2008, Finian J. Murphy, Ed.D., performed a mental health evaluation for DDS.  Tr. 254-258.  Unlike the ALJ who had the whole record before him, the only medical records Dr. Murphy reviewed were the June 26, 2006 records from Peggy Halter.  Salasar informed Dr. Murphy he last worked at St. Martins for four to five months and left to go into a rehabilitation program and was still in this program and had not worked since.  Tr. 255.  Salasar also reported he was addicted to crack but had "been free from this for the past 6 months."  *Id.*  Salasar further reported he had frequent mood swings, was very depressed at times and then could be extremely euphoric, and had extreme difficulty focusing on anything for any length of time.  Tr. 256.

11

Dr. Murphy noted Salasar's activities of daily living were within the normal range, he was oriented in all spheres, had average intelligence, his ability to understand instructions was within the normal limits, his ability to carry out instructions, to concentrate and to persist at tasks was seriously limited by his psychological problems, and he could handle his own benefit payments.  Dr. Murphy assigned a GAF score of 35.

Dr. Murphy noted:

Current Emotional and Mental Status

**Emotional Status**:  **The claimant's mood level during the evaluation was within normal limits.  His affect was anxious.  His thought processes were normal.  His eye contact was good, his posture was appropriate and his manners polite.  His responses to questions were appropriate and detailed.   His movement was within normal limits**.  His relationship with his family is not good.  He believes he can get along well with people as long as they don't find fault with him.

**Mental Status**: In speech and language, he appears to have normal hearing and spoke in a normal tone of voice.  He used correct grammar.  **His speech was audible, understandable and coherent.   The claimant was oriented in all spheres.  The claimant knew the day, month and year as well as the city he was in.**  He knew that he had come by car and could name the current and past president of the USA.  He could name the current governor of the state.  He knew that the state capitol was Santa Fe.

When asked to remember 3 words and then repeat them three minutes later, he was able to remember only the first one.  When asked to name 3 large cities in the US, he said, "New York, Los Angeles and Dallas."  He knew that the capitol of the US was Washington, DC, that Tiger Woods was a golfer, and "The Lobos" is the nickname of the UNM sports teams.  He could spell "radio" forward and backward.  The claimant could not do serial 7's but could do serial 3's.  He could do basic math calculations.  He was able to demonstrate his ability to make change.  **His judgment was average**.  If he found a letter, addressed, stamped and sealed, he would put it in the mailbox.  If he were the first to notice fire in a theater, he would tell the manager.  He knew how a bush and a tree were similar and different as well as how an apple and bananas were similar and different.  He correctly interpreted common proverbs: "Don't cry over spilled milk;" and "Don't judge a book by its cover."  The claimant has average intelligence.  The claimant has the ability to handle his own benefit payment.

Tr. 256-257.

12

On January 22, 2008, Salasar returned to HCH for a follow up.  Tr. 292-294.  **Carlson performed a Mental Status exam, noting: (1) affect- labile; (2) attitude- cooperative; (3) speech- within normal limits; (4) appearance- appropriate; (5) mood- labile, irritable; (6) quality of thought- distractible; (7) insight- fair; (8) judgment- fair.**  Under "Progress Note," Carlson noted:

> Pt saw SSI psychiatrist who agrees with dx Bipolar and PTSD dx.  Working with attorney on SSI case.  States she (sic) is feeling "more high and manic" lately then crashes and sleeps for "about a day and a half."  States that highs last "a couple of days."  Sleeping well overall, except when 'I'm too manic."  Six months clean and sober n Feb 1st.  Pt has sustained head injury as a child and again in prison not in his early adulthood.  Has difficulty with short term memory.  Pt c/o a lot of irritability.  Speech is somewhat pressured, thoughts are linear, judgment and insight are improving, short term memory is poor.

Tr. 293.  Carlson assessed Salasar with "Mood instability."  *Id.*  Carlson prescribed Carbamazepine 200 mg (used in the treatment of Bipolar Disorder), directed him continue with his other medications and to return in one month.  *Id.*

On February 22, 2008, Salasar returned to HCH for follow up and for medication refills.  Tr. 289-291.  Carlson performed a Mental Status exam, noting: (1) affect- labile; (2) attitude- guarded; (3) speech- pressured; (4) appearance- appropriate; (5) quality of thought- racing, tangential, distractible; (6) insight- fair; and (7) judgment- fair.  Tr. 290.  Under "Progress Note," Carlson noted:

> Pt states "**there was a relapse." States that he had a relapse "the day after he got 6 months sober" x 3 days, used crack**.  Clean x 1 week and was in MATS x 4days.  Staying at the Sobriety House.  Pt states that he took Carbamazephine and did not experience any mood stability from that.  Stopped taking it " a couple of days ago."  Pt has pressured speech, thoughts are tangential, rambling.  Affect is variable.  Pt is irritable.

Tr. 290.  Carlson assessed Salasar as "Moods very unstable."  *Id.*  Carlson directed to return in two weeks.  Carlson also ordered a Lithium level to be drawn on February 29.

On March 7, 2008, Salasar returned to HCH for a follow up and to request his GA (General Assistance) form be signed.  Tr. 286-288.  **Carlson performed a Mental Status Exam, noting: (1) affect- consistent; (2) attitude- cooperative; (3) speech- pressured; (4) appearance- appropriate; (5) mood- consistent; (6) insight- good; and (7) judgment- fair**.

Tr. 286-287.  Carlson's "Progress Note" for Salasar indicates:

> Pt states he is **almost one month** clean- still craving crack sometimes but is staying away from it.  Speech is pressured, **thoughts are linear and logical, well organized**. So far is tolerating Lithium, was not able to get a lithium level yet– states he is still irritable at times.  **Thoughts much better organized today**.  Still easily agitated.

Tr. 287.  **Carlson assessed Salasar as "Much better."**  *Id.*  On March 11, 2008, Salasar returned to HCH to have his blood drawn for lab work.  Tr. 336.

On March 30, 2008, Salasar returned to HCH for a follow up.  Tr. 283-285.  **Carlson performed a Mental Status Exam, noting: (1) affect- consistent; (2) attitude- cooperative; (3) speech- within normal limits; (4) appearance- appropriate; (5) mood- labile; (6) quality of thought- distractible; (7) insight- fair; and (8) judgment-fair.** Tr. 283-284.  Under "Progress Note," Carlson noted:

> **Pt states he is clean 36 days "and counting."  Has gotten an apartment with his girlfriend who works at Tamaya and this is going OK in the relationship**.  Pt notes that he is craving drugs a lot "especially when I feel good."  Sleeping well, pt is somewhat agitated and moods are still up and down. Trying to stay busy so he doesn't use drugs.  **Speech is pressured, thoughts are linear and well organized. Pt is fidgety today**.  Lithium level is 0.3.  Pt was abandoned by biological father before birth and abused by step-father– through this learned negative self image.

14

Tr. 284.  Carlson assessed Salasar as "Moods unstable" and increased the Lithium dosage.  *Id.*

Carlson directed Salasar to return in one month and ordered a Lithium level be drawn on March

24.

On April 30, 2008, Carlson saw Salasar for his follow up and "med. refills."  Tr. 280-

282.  **Carlson performed a Mental Status Exam, noting: (1) affect- consistent; (2) attitude-**

**cooperative; (3) speech- within normal limits; (4) appearance- appropriate; (5) mood-**

**consistent; (6) insight- good; and (7) judgment- good**.  Under "Progress Note," Carlson noted:

> **Pt here from work today**.  Lithium level was 0.3 with 600 mg Lithium.  Hasn't
> gotten a level for 900 mg so far.  **States that increased dose has helped him to feel**
> **less upset and irritable.**  Dealing with ongoing issues related to abuse and
> abandonment– liking therapy right now.  **Speech is WNL, thoughts linear and**
> **organized, sleeping and eating well.  Doing well in relationship with girlfriend.**
> **Denies any cravings for crack since increase in Lithium.**

Tr. 281.  Carlson assessed Salasar as **"Doing OK."**  *Id.*  Carlson kept Salasar on the same

medications and directed him to return in one month and ordered Lithium level to be done on

May 6, 2008.

On June 9, 2008, Carlson saw Salasar for his follow up.  Tr. 277-279.  **The Mental**

**Status Exam indicated as follows: (1) affect- consistent; (2) attitude- cooperative; (3) speech**

**within normal limits; (4) appearance- appropriate; (5) mood- consistent; (6) insight- good;**

**and (7) judgment- good.**  Under "Progress Notes," Carlson noted:

> Pt states that his back is hurting a lot lately, **doing a lot of landscaping work right**
> **now**.  Pt doing well on 900 mg Lithium– level is 0.07.  States that he still has days
> where he is somewhat angry and upset "but I didn't use drugs, I just talked about it."
> **Pt still doing OK in relationship with girlfriend.  Speech is WNL, thoughts**
> **linear and well organized, functioning well overall.  Pt is staying clean x 4**
> **months, denies any craving.**  Getting ready to return to Dragonfly– got another
> voucher through AMCI.

15

Tr. 278.  Carlson assessed Salasar as **"Doing OK"** and directed him to continue the same medications and return in one month.  *Id.*

On July 10, 2008, Carlson completed a Questionnaire.  Tr. 266-269.  Carlson indicated she had been treating Salasar less than a year, from October 2007 to the date of the Questionnaire.  Carlson assessed Salasar with Bipolar Disorder, PTSD and cocaine dependence. Tr. 266.  Carlson had prescribed Lithium, Risperdal, and Zoloft and recommended counseling. *Id.*  She opined Salasar met the criteria for Listings 12.04 and 12.06.  Carlson evaluated Salasar as moderately restricted in activities of daily living, markedly restricted in maintaining social functioning, markedly restricted in concentration, persistence or pace, and indicated Salasar had three episodes of decompensation.  Tr. 269.  **Carlson stated Salasar's condition had been at this severity for ten years and expected his condition to be at this severity for 2-3 years.  *Id.***

On July 10, 2008, Salasar was in for a "follow up and refills."  Tr. 274-276.  The "Current Medications" were Risperdal, Sertraline HCL, Viagra, and Lithium.  The "Current Problems" listed were Bipolar Disorder, Cocaine/Crack Dependence, Depression, Major, Recurrent, Moderate, and PTSD, Chronic.  *Id.*  **Carlson performed a Mental Status Exam, noting the following: (1) affect- consistent; (2) attitude- cooperative; (3) speech- pressured; (4) appearance - appropriate; (5) mood- consistent; and (6) judgment- good**.  Tr. 274-275. Carlson noted Salasar had gotten his AMCI voucher and was going back to Dragonfly Counseling, and was attending relapse prevention group.  Salasar reported he was craving crack cocaine and was afraid of dealing with his trauma.  Carlson refilled his medications, increasing Risperdal to 2 mg, encouraged him to talk to therapist about stress management skills and instructed him to return in one month.

16

On August 18, 2008, Salasar returned for a follow visit.  Tr. 328-330.  **Carlson performed a Mental Status Exam, noting: (1) affect- consistent; (2) attitude- cooperative; (3) speech- pressured; (4) appearance- appropriate; (5) mood- consistent; (6) insight- fair; and (7) judgment- fair**.  Tr. 329.  Under "Progress Note," Carlson noted:

> **Pt states that he was laid off from his job because he relapsed.  Is currently at AOC, staying clean x 1.5 months**.  Girlfriend staying with her mom in Bernalillo.  Pt is agitated today– is off his Risperdal "because I couldn't get down here for a refill."  Pt still working on his disability case– working with attorney who has prepared a brief.  Pt is attending counseling at Dragonfly Counseling every Saturday.  Thinking about going into program "I don't want to be homeless."  Speech is pressured, thoughts linear and logical, well organized.

Tr. 329.  Carlson assessed Salasar as "Agitated today."  *Id.*  Carlson directed Salasar to return in one month.  *Id.*

On September 29, 2008, Salasar returned to HCH for a follow visit.  Tr. 325-327.  Under "Progress Note," Carlson noted:

> Pt still staying at AOC for a few more weeks.  Working on getting into a tx program through "Office of Substance Abuse programs."  Is looking into transitional housing through MATs– currently receiving GA (General Assistance).  Still getting individual counseling at Dragonfly counseling.  Girlfriend still in Bernalillo "things are strained"– girlfriend in recovery and couple see each other at meetings only. **Pt has been clean and sober almost 4 months.**  Sleeping and eating OK, in spite of bedbugs at AOC**.  Pt doing better since increasing Risperdal, calmer with well organized thought processes.  Moods are up and down "I'm easily frustrated because of this situation with girlfriend and housing**.

Tr. 326.  Carlson assessed Salasar as "stressed, but staying clean and sober."  Carlson directed Salasar to return in one month.

On November 17, 2008, Salasar returned to HCH for a follow visit.  Tr. 320-324.  Salasar complained of an increased anxiety level during the daytime.  Tr. 320.  **Carlson performed a Mental Status Exam, noting: (1) affect- consistent; (2) attitude- cooperative; (3) speech-**

**pressured; (4) appearance- appropriate; (5) mood- labile; (6) quality of thought- racing,
tangential, distractible; (7) insight- fair; and (8) judgment- fair**.  Tr. 321.  Under "Progress
Note," Carlson noted:

> Pt is currently staying in MATS and in day program at CLA– feels that things are
> going well so far x 1 week.  **Pt reports he has been using crack every 4-5 days for
> "awhile."  Clean since November 2nd.**  Pt notes that he is sleeping well and very
> anxious during the day. "I feel really unstable."  Speech is pressured, c/o racing
> thoughts "I feel that I am going to jump out of my skin."  Pt sleeping 7 hours/noc.
> Has tried Propranolol in past for anxiety and it has been helpful– wanting to try this
> again.

Tr. 321.  Carlson assessed Salasar as "**Clean 2 weeks**, trying to get into CLA."  *Id.*  Carlson

prescribed Propranolol for his anxiety and directed him to return in one month.

On December 30, 2008, Salasar returned to HCH for a follow up visit.  Tr. 316-319.

**Carlson performed a Mental Status Exam, noting: (1) affect labile; (2) attitude-
cooperative; (3) speech- pressured; (4) appearance- appropriate; (5) insight- good; and (6)
judgment- good.**  Under "Progress Note," Carlson noted:

> Pt doing well at CLA– enjoying being at the house– did a lot of cooking for the
> holidays.  Is concerned about wt gain recently since being at the house.  Thought
> Propranolol was causing his wt gain but is not exercising much except lifting wt.
> Propranolol helps his anxiety and wants to continue it.  **Speech is somewhat
> pressured, thoughts are linear and logical, well organized.  Affect variable,
> bright at times.  60 days clean and sober– has same sponsor.**

Tr. 317.  Carlson assessed Salasar as "**Doing OK at CLA and wt gain**."  *Id.*  Carlson

recommended setting up a plan for "more cardio exercises and more water, less fats and carbs."

*Id.*

On January 2, 2009, Salasar returned to HCH for an annual Physical Examination with

Mathias Vega, M.D.  Tr. 310-313.  The exam was unremarkable and his lab work was "all within

normal limits." Tr. 312. **Salasar reported he was sleeping well and his energy level was**

**good**. *Id.*

On February 5, 2009, Salasar returned to HCH for his follow up appointment. Tr. 307-

309. **Carlson performed a Mental Status Exam, noting: (1) affect- consistent; (2) attitude-**

**cooperative; (3) speech- within normal limits; (4) appearance- appropriate; (5) mood-**

**consistent; (6) insight- good; (7) judgment- good**. Tr. 307. Under "Progress Note," Carlson

noted:

> Pt is doing well at CLA, very sad that a resident recently died of possible OC "it was
> terrible." Speech is pressured, **thoughts linear and logical**. Is trying to cut down
> on fats and portions, eating healthier foods, but is still smoking heavily and not
> exercising much. Has chronic bronchitis. Still planning on returning to Dragonfly–
> has spoken with counselor there to get back into counseling. Trying to get GA
> (General Assistance). Sleeping well. Pt almost 90 days sober.

Tr. 308. Carlson assessed Salasar as "Dealing with loss of another CLA resident." *Id.* Carlson

directed Salasar to return in one month.

On April 21, 2009, Salasar returned to HCH for his follow up appointment. Tr. 304-306.

**Carlson performed a Mental Status Exam, noting: (1) affect- consistent; (2) attitude-**

**cooperative; (3) speech- within normal limits; (4) appearance- appropriate; (5) mood-**

**consistent; (6) insight- good; and (7) judgment- good**. Tr. 304-305. Carlson's Progress Note

indicated as follows:

> **Pt is still at CLA which is doing well**. **Wants to got to school in May at CNM to**
> **study child, youth, family development with eventual goal of getting BA in**
> **counseling.** Never followed up with own counseling at Dragonfly but is getting
> EMDR (Eye Movement Desensitization and Reprocessing, form of therapy used for
> PTSD) at CLA with students. Sees how he has numbed himself in past to deal with
> trauma issues. __Speech is WNL, pt is animated, smiling, affect variable, mainly__
> __bright.__ Continues to gain wt. States he is not exercising much due to pain in
> clavicle. Wanting to cut out sugar. Plans to go to VDP after CLA in fall. **Sleep is**
> **good, moods are stable. Pt is coming up on 6 months clean and sober.**

19

Tr. 305.  **Carlson assessed Salasar as "Doing OK."**  She kept Salasar on the same

medications and directed him to return for a follow up in one month.

On May 12, 2009, Salasar returned to HCH for a follow up visit.  Tr. 301-303.  **Carlson**

**performed a Mental Status Exam, noting: (1) affect- consistent; (2) attitude- cooperative;**

**(3) speech- pressured; (4) appearance- appropriate; (5) mood- consistent; (6) insight- good;**

**(7) judgment- good**.  Under "Progress Note," Carlson noted:

> Pt happy to say that he **celebrated 6 months clean and sober last weekend**- "I got
> through it one day at a time."  Talking about tools he has developed in his recovery.
> **Starting school next week and getting ready to go to VDP within next couple of
> months.  Is cutting back on sugar and exercising on his bike– has lost 3 # so far.
> Speech is WNL, thoughts linear and logical, well organized.  <u>Affect is bright.</u>
> Liking counseling which was overwhelming for a while, but is better now**.

Tr. 302.  **Carlson assessed Salasar as "Doing well."**  Carlson kept Salasar on the same

medications, Risperdal, Sertraline HCL, Lithium Carbonate, and Propranolol.  *Id*.  Carlson

directed Salasar to return in one month for follow up care.  *Id.*

On June 22, 2009, Carlson completed a Questionnaire.  Tr. 342.  Carlson indicated she

had been treating Salasar since October 2007, and she diagnosed him with Bipolar Disorder,

PTSD, and Cocaine Dependence.  *Id.*  In her Questionnaire, Carlson noted Salasar had "recent

relapse on cocaine– left CLA tx (treatment) program" and recommended Salasar "reestablish

recovery program."  Tr. 342.  Carlson opined Salasar met Listings 12.04- Affective Disorders,

12.06- Anxiety Related Disorders, and12.08- Personality Disorders.  Tr. 343-345.  Carlson

opined Salasar was markedly restricted in activities of daily living, markedly restricted in

maintaining social functioning, markedly restricted in concentration, persistence and pace, and

had experienced three episodes of deterioration or decompensation in work or work like settings.

Tr. 346.  Carlson also completed a Mental Residual Functional Assessment, finding Salasar "markedly limited in 14 areas.  Tr. 347348.

**Dragonfly Counseling**

On December 1, 2007, Kristen Fudzinski, LISW (Licensed Independent Social Worker) at Dragonfly Counseling completed an Assessment and Treatment Plan.  Tr. 260-262.  **On this visit, Salasar reported being clean from crack cocaine for four months**.  *Id.*  Salasar was seeking treatment for assistance with depression, resentments of childhood and triggers.  Salasar also reported being "**highly involved in NA groups & is planning on going back to school**." *Id.*  Fudzinski assessed Salasar with Alcohol Abuse in full remission, **cocaine dependence, early full-remission**, PTSD with delayed onset, and economic hardship due to unemployment, legal and interpersonal stressors.  Fudzinski assigned Salasar a GAF score of 55.  Fudzinski noted she would continue to see Salasar once a week.

Fudzinski completed a Mental Status Exam.  Tr. 357.  **The Mental Status Exam indicates as follows: (1) not suicidal or homicidal; (2) moderate impulse control; (3) his appearance was appropriate; (4) posture was normal; (5) affect was normal and appropriate to context; (6) movement was restless; (7) speech/content was normal; (8) personality was cooperative; (9) consciousness was normal; (10) oriented to time, place, person and situation; (11) thought was appropriate; (12) thought process was logical, organized and rational; and (13) intelligence was average**.  Tr. 357.

On January 19, 2008, Fudzinski set Salasar's "Treatment Goals."  Tr. 261, 356.  The plan included Salasar abstaining from using drugs or alcohol (1) by continuing to be engaged in NA, (2) by continuing to meet with the psychiatrist, and (3) by continuing to meet with Fudzinski on a weekly basis.  *Id.*  Under the "Interpersonal Domain," Salasar was to decrease his self-

21

centeredness and depression and increase his empathy and knowledge of coping skills (1) by discussing issues with empathy; (2) by discussing healthier coping skills; and (3) by working through on past resentments. *Id.*

On June 14, 2008, Fudzinski set up an "AMCI Individual Treatment Plan" for Salasar. Tr. 352-353.  Fudzinski assessed Salasar with Intermittent Explosive Disorder and Cocaine Dependence with physiological dependence in early remission.  Part of Salasar's goals was to "increase in anger management" and a "decrease in the severity of violent anger outbursts."  Tr. 353.  To maintain his sobriety, Salasar was to continue in an NA group daily, and meet with his therapist weekly.

On June 21, 2008, Salasar met with Fudzinski.  Tr. 351.  Fudzinski's Progress Note indicates Salasar was concerned about his relationship with his girlfriend.  Salasar acknowledged he had control issues and admitted he got upset when he couldn't control his girlfriend enabling her son.  Salasar agreed not to get involved in his girlfriend's relationship with her son.

On July 5, 2008, Salasar returned for individual therapy with Fudzinski.  Tr. 350.  **Fudzinski noted Salasar had been clean since February 2008 but had "recent relapse this week."  Salasar had also "used crack on Sunday of last week**."  *Id.*  Fudzinski's noted, "[Salasar] had made up his mind last week that he wanted to use so he stopped sharing in meetings, stopped talking to sponsor and avoided positive influences."  *Id.*  Salasar had admitted himself to MATS for 3 days to detox and wanted to start going to Relapse Prevention Group. Fudzinski directed Salasar to keep a journal and gave him some worksheets on addiction and recovery.

On July 12, 2008, Salasar saw Fudzinski for individual therapy.  Tr. 349.  Salasar reported he was frustrated with the NA group because he felt he was not getting anything out of

it.  However, Salasar liked the Relapse Prevention Group.  Salasar had not done the assignments

Fudzinski assigned him the previous visit.  Fudzinski directed Salasar to continue going to two

NA meetings daily and attend the Relapse Prevention Group.  Salasar also was to continue

seeing Fudzinski once a week.

On July 12, 2008, Kristen Fudzinski, LISW (Licensed Independent Social Worker) with

Dragonfly Counseling completed a Questionnaire and a Mental Residual Functional Assessment.

Tr. 337-341.  Fudzinski noted she had been treating Salasar since November 2007.  Tr. 337.  She

diagnosed Salasar with Intermittent Explosive Disorder and Cocaine Dependence with

physiological dependence, in early full remission.  *Id.*  Fudzinski opined Salasar met Listings

12.06.  Tr. 338.  Fudzinski opined Salasar was markedly restricted in activities of daily living,

moderately restricted in maintaining social functioning, markedly restricted in concentration,

persistence or pace resulting in failure to complete tasks in a timely manner (in work settings or

elsewhere), and had experienced four or more episodes of deterioration or decompensation.  Tr.

339.

### J. LeRoy Gabaldon Evaluation

On January 18, 2008, J. LeRoy Gabaldon, Ph.D., a psychologist and agency

nonexamining consultant, evaluated Salasar.  Tr. 358-375.  Dr. Gabaldon completed a

Psychiatric Review Technique form (Tr. 358-371) and a Mental Residual Capacity Assessment

(Tr. 372-375).  On this date, Salasar was reporting he was clean for six month.  Dr. Gabaldon

noted:

> Mr. Salasar alleges to be unable to work due to his mental and physical problems.
> His assertion of impairment does not appear to be consistent with available evidence.
>
> Mr. Salasar was able to complete high school and has a college education.  He
> admits to a long history of acting-out, legal problems and incarcerations totally

thirteen years.  He reports a history of several suicide attempts with the last being in 1985.  Substance abuse is not a current issue.  He currently resides in a recovery house.  His functional ability is appropriate to circumstance.  **Dr. F. Murphy evaluated him on 15 January 2008.  There was no indication of thought disorder, suicidal intent or severe cognitive limitation.  Dr. Murphy does comment on some possible limitations that Mr. Salasar may have, however, these limitations are not supported through his mental status nor his functional information**.

Claimant can understand, remember, and carry out simple instructions, make simple decisions, attend and concentrate for two hours at a time, interact adequately with co-workers and supervisors, and respond appropriately to changes in a routine work setting.

Tr. 374.

## IV.  Discussion

In order to qualify for disability insurance benefits or supplemental security income payments, a claimant must establish a severe physical or mental impairment expected to result in death or last for a continuous period of twelve months which prevents the claimant from engaging in substantial gainful activity.  *Thompson v. Sullivan*, 987 F.2d 1482, 1486 (10th Cir. 1993)(citing 42 U.S.C. §423(d)(1)(A)).  The regulations of the Social Security Administration require the Commissioner to evaluate five factors in a specific sequence in analyzing disability applications. 20 C.F.R. § 404.1520 (a-f).  The sequential evaluation process ends if, at any step, the Commissioner finds the claimant is not disabled.  *Thompson*, 987 F.2d at 1487.

At the first four levels of the sequential evaluation process, the claimant must show he is not engaged in substantial gainful employment, he has an impairment or combination of impairments severe enough to limit his ability to do basic work activities, and his impairment meets or equals one of the presumptively disabling impairments listed in the regulations under 20 C.F.R. Part 404, Subpt. P, App. 1, or he is unable to perform work he had done in the past. 20 C.F.R. §§ 404.1520 and 416.920.  At the fifth step of the evaluation, the burden of proof shifts to

the Commissioner to show the claimant is able to perform other substantial gainful activity

considering his residual functional capacity, age, education, and prior work experience.  *Id.*

At step two of the sequential evaluation process, the ALJ found Salasar had the following

severe impairments: (1) Bipolar Disorder, (2) PTSD, (3) a generalized anxiety disorder, (4) an

anti-social personality; and (5) cocaine abuse.  Tr. 14.  At step three, the ALJ found Salasar's

mental impairments, including the substance abuse disorder, met Listing Sections 12.04, 12.06,

12.08 and 12.09.  The ALJ found that both the  "paragraph A" criteria and the "paragraph B"

were satisfied.  Tr. 14-15.

Because this case presents the issue of drug abuse, the ALJ's analysis required an

additional step.  Under the regulations, "an individual shall not be considered to be disabled . . .

if alcoholism or drug addiction would . . . be a contributing factor material to the

Commissioner's determination that the individual is disabled."  See 42 U.S.C. §1382c(a)(3)(J).

Section 416.935 states:

> (b) Process we will follow when we have medical evidence of your drug addiction
> or alcoholism.
>
> (1) The key factor we will examine in determining whether drug addiction or
> alcoholism is a contributing factor material to the determination of disability is
> whether we would still find you disabled if you stopped using drugs or alcohol.
>
> (2) In making this determination, we will evaluate which of your current physical
> and mental limitations, upon which we based our current disability determination,
> would remain if you stopped using drugs or alcohol and then determine whether any
> or all of your remaining limitations would be disabling.
>
> (i) If we determine that your remaining limitations would not be disabling, we will
> find that your drug addiction or alcoholism is a contributing factor material to the
> determination of disability.
>
> (ii) If we determine that your remaining limitations are disabling, you are disabled
> independent of your drug addiction or alcoholism and we will find that your drug

addiction or alcoholism is not a contributing factor material to the determination of
disability.

20 C.F.R. § 416.935.  Additionally, when a claimant is disabled and his mental impairments

cannot be separated from the effects of substance abuse, the drug addiction and alcoholism is not

a contributing factor material to disability.  *Salazar v. Barnhart*, 468 F.3d 615, 623 (10th Cir.

2006).

Applying this regulation, the ALJ found that "[i]f claimant stopped the substance use, the

remaining limitations would cause more than a minimal impact on the claimant's ability to

perform basic work activities; therefore, the claimant would continue to have a "severe"

impairment or combination of impairments."  Tr. 15. Nonetheless, the ALJ found that "[i]f

claimant stopped the substance use, the claimant would not have an impairment or combination

of impairments that meet or medically equals any of the impairments listed in 20 C.F.R. Part

404, Subpart P, Appendix 1 (20 C.F.R. §416.920(d)."  *Id.*  Specifically, the ALJ found that "[i]f

the claimant stopped the substance use, the remaining limitations would not meet or medically

equal the criteria of Listing Sections 12.04, 12.06, 12.08, or 12.09."  *Id.*

Once the ALJ found that Salasar was not disabled at step three because his drug addiction

was a contributing factor to the determination of disability, he proceeded to step four.  At step

four, the ALJ found that if Salasar stopped using drugs, he would have the RFC "to perform a

full range of work at all exertional levels but with the following non-exertional limitations: the

abilities to understand, remember, and carry out simple instructions and to make simple

decisions; to attend and concentrate for two hours at a time; and to respond appropriately to

changes in a routine setting and a limitation to public contact no more than incidental to the work

performed." Tr. 16-17.  Relying on a vocational expert (VE), at step five, the ALJ found Salasar

was not disabled.

Salasar contends the ALJ's finding that his drug addiction was a contributing factor

material to his disability is not supported by substantial evidence.  The Court disagrees.  Salasar

argues that the Questionnaires submitted by Fudzinski and Carlson do not support the ALJ's

finding.  However, in addressing Fudzinski's June 28, 2008 evaluation, Carlson's July 10, 2008

Questionnaire and Carlson's June 22, 2009 Questionnaire, the ALJ noted that these assessments

were conducted "at or around the time of the claimant's relapse on cocaine."  Tr. 19-20.  Salasar

concedes that the ALJ is correct in stating that he had a relapse around the time of Fudzinski's

Questionnaire.  Pl.'s Mem. Support Mot. Reverse at 11.  On July 8, 2008, Fudzinski noted,

"[Salasar] discussed recent relapse this week [& last week]."  Tr. 350.  Carlson completed her

first Questionnaire two days later, on July 10, 2008.  In her June 22, 2009 Questionnaire Carlson

noted that she based her opinion on Salasar's "recent relapse on cocaine- left CLA tx program."

Tr. 239.  Thus, the ALJ properly considered the opinions of Fudzinski and Carlson and accorded

them the proper weight.  Moreover, the Court notes that Carlson performed a Mental Status

Examination whenever Salasar came to see her and, when he was clean for any extended period

of time, the Mental Status Examinations do not support Carlson's Questionnaires.

"The most useful evidence that might be obtained in [a case such as this one] is that

relating to a period when the individual was not using drugs/alcohol."  *Salazar*, 468 F.3d at 623

(quoting Commissioner's teletype addressing how to determine materiality).  The Court has

meticulously reviewed and set forth the medical evidence and finds that substantial evidence

supports the ALJ's finding that Salasar would not be disabled based on his impairments if he

stopped using drugs.  (See Section III above– bolded language).  The medical records reflect

27

that during periods of sobriety Salasar's Mental Status Examinations improved and he was capable of working.  Tr. 239 (worked as a graphic artist until  he lost his job because of drug use); Tr. 281 (April 30, 2008– "Pt here from work today."); Tr. 277 (June 9, 2008– "doing a lot of landscaping work right now"); Tr. 329 (August 18, 2008– "Pt states that he was laid off from his [landscaping] job because he relapsed." ). Significantly, during the longest period of sobriety, Salasar was successful in completing a Bachelor of Fine Arts Degree and had almost earned enough credits for a second bachelor degree. Tr. 239 (Dr. Brashar noted Salasar's longest period of sobriety was between 1995 and May 2006, with "[m]ost of this 'clean time' occurr[ing] while incarcerated in prison." and "[E]arned a Bachelor's Degree of Fine Arts while in prison and has almost enough credits for a second Bachelor's Degree." ).

**Conclusion**

The Court's role is to review the record to ensure that the ALJ's decision is supported by substantial evidence and that the law has been properly applied.  The Court's limited review precludes the Court from reweighing the evidence or substituting its judgment for that of the Commissioner.  *See Woodward v. Shalala*, 30 F.3d 142, 1994 WL 408169 (10th Cir. 1994)(unpublished opinion)("While we acknowledge the presence of evidence in the record which may tend to establish claimant's disability, the determinative conclusion is that there is also substantial evidence to support the ALJ's finding of no disability.  It is not our role on appeal from this agency determination to reweigh the evidence or to substitute our judgment for that of the [Commissioner].").  As long as substantial evidence supports the ALJ's determination, the Commissioner's decision stands.  After such review, the Court finds that the ALJ's finding that Salasar's drug addiction was a contributing factor material to his disability is

supported by substantial evidence.  Accordingly, Plaintiff's Motion to Reverse or Remand the Administrative Agency Decision is **DENIED.**

A judgment in accordance with this memorandum opinion and order shall be entered.

_____

**DON J. SVET**
**United States Magistrate Judge**